1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**CENTRAL DISTRICT OF CALIFORNIA**

10

11  UNITED STATES OF AMERICA,          Case No.: 2:21-cv-06012-CBM-
                                        (RAOx)
12          Plaintiff,

     v.
13                                      **ORDER RE: PLAINTIFF'S**
     DENISE DIMACALE, et al,            **MOTION FOR SUMMARY**
14                                      **JUDGMENT [77]**
            Defendants.
15

16

17          The matter before the Court is Plaintiff United States of America's Motion

18  for Summary Judgment.  (Dkt. No. 77.)  There are two Oppositions to the Motion:

19  one filed by Defendants Denise and Daniel Dimacale and another filed by

20  Defendant Nicole Dimacale.  (Dkt Nos. 80, 81.)  Plaintiff filed two Replies

21  addressing each Opposition.  (Dkt. Nos 82, 83.)

22

23                  **I.      BACKGROUND**

24          This case concerns the United States' attempt to foreclose on a tax lien

25  attached to a property to pay an outstanding tax liability allegedly owed by

26  Defendant Denise Dimacale.  The United States claims that it has a valid tax lien

27  against Denise Dimacale, which attached to her property and rights to property.

28          Denise Dimacale transferred the Property to a "qualified personal residence

trust" (the "Trust").  The United States claims that the transfer of the Property to the Trust while Denise Dimacale retained possession and enjoyment of the Property does not preclude attachment of the federal tax lien.  In the Complaint, the United States alleges that the transfer of the Property to the Trust should be set aside because (1) it is a fraudulent conveyance and (2) the Trust holds the Property as a "nominee" of Denise.

**1.  Purchase of Property**

Defendants Denise and Daniel Dimacale have been married since 1983. (SUF 1 – Dkt. No. 77-1.)  On June 3, 1996, Denise and Daniel Dimacale purchased real property located at 1794 Port Tiffin Circle in Newport Beach, California (the Property).  (SUF 2.)  The Property was purchased for $888,000 and initially had a mortgage of $577,500.  (SUF 3.)

**2.  FTC Judgment**

Denise Dimacale was an owner, secretary, and director of a business known as World Class Network, Inc. ("WCN").  (SUF 4.)  Daniel was co-owner of WCN and the Chairman of the Board of Directors.  (SUF 5.)  They have one child named Nicole Dimacale, who is also a named Defendant in this case.  (Daniel Decl. at ¶ 4.)  On February 28, 1997, the Federal Trade Commission ("FTC") brought suit against WCN, Daniel Dimacale, Denise Dimacale, and others in the case of *Federal Trade Commission v. World Class Network, Inc. et al.*  (SUF 6.) On May 6, 1997, the district court entered judgment against Daniel and Denise in the amount of $1,702,000.  (SUF 7.)

In her declaration, Denise stated that she and Daniel fully paid off the FTC judgment by May 31, 1997.  (Denise Decl. – Dkt. No. 81-4 at ¶ 11.)

**3.  Use of the Property Under the Trust**

On August 12, 1997, three months after the $1.7 million judgment was

1  entered against them, Daniel and Denise Dimacale formed the "NCD Qualified

2  Personal Residence Trust" (the "Trust").  (SUF 8.)  On August 20, 1997, a grant

3  deed was recorded transferring the Property from Daniel and Denise to Felicisima

4  Reyes, as trustee of the Trust.  (SUF 9.)  Felicisima Reyes is the aunt of Daniel

5  Dimacale. (SUF 10.)  Denise and Daniel both declare that, at the time they

6  transferred the Property to the Trust, they were unaware of any material debts or

7  potential problems with their income tax returns for the 1996 or 1997 tax years.

8  (Daniel Decl. ¶ 21; Denise Decl. ¶¶ 19–20.)

9  A QPRT provides the transferor the right to live in a personal residence for

10  a defined term.  After that term, the trust terminates and distributes the personal

11  residence to the beneficiary.  To qualify as a QPRT, a trust must contain certain

12  required terms, including (but not limited to) that (1) the trust be irrevocable, (2)

13  the trustor must use the residence as their personal residence during the trust term,

14  and (3) the trust must only hold the personal residence.  *Id*.  In this case, pursuant

15  to the QPRT, Daniel and Denise have lived rent-free in the Property since the

16  Trust was formed.  (SUF 11.)

17  Nicole Dimacale also cites to an IRS sample declaration of trust, posted in

18  2003, that demonstrates a trust document that meets the QPRT requirements.  *See*

19  IRS Rev. proc. 2003-42, 2003-1 C.B. 993.  The sample trust declaration provides

20  that a trustor "retains no right, title, or interest in any trust asset except as

21  specifically provided in this trust instrument."  *Id*., Section 4.  Additionally, during

22  the term of the QPRT, "the Transferor shall have the exclusive rent-free use,

23  possession, and enjoyment of the Residence."  *Id*.  Lastly, "[t]he Transferor shall

24  be responsible for the payment of all costs associated with the Residence,

25  including but not limited to mortgage payments, property taxes, utilities, repairs,

26  maintenance, and insurance."  *Id*.

27  There is no dispute that, from the date the Trust was formed to present,

28  Daniel and Denise Dimacale paid a portion of the utilities, maintenance, repair and

improvement costs, insurance, and taxes associated with the property. (SUF 12.) The Trust has also not had a bank account since its creation. (SUF 13.) For tax years 2016 through 2020, Daniel and Denise Dimacale claimed the home mortgage interest deduction on Schedule A of their U.S. Individual Income Tax Returns in the amount of $44,470 for 2016, $50,482 for 2017, $49,372 for 2018, $51,572 for 2019, and $40,714 for 2020. (SUF 14–18).

### 4. Gift Tax and Dimacale's Use of Estate Planner

As a part of transferring a personal residence into a QPRT, the trustor must file an IRS For 709 Gift Tax Return to report the interest transferred to the QPRT beneficiary. At the end of the QPRT trust term, the beneficiary receives title to the personal residence and the trust terminates. The beneficiary's right to the property in the future is a present gift subject to U.S. gift tax in the year the QPRT is formed.

Denise and Daniel Dimacale sought the assistance of their estate planning attorney to assist them with their estate plan. (Denise Decl. ¶ 12.) Their attorney drafted a will, family trust, durable power of attorney, nomination of conservator, declaration of intent, and the Trust. (Daniel Decl. ¶ 12.) None of the documents are challenged by the United States. Denise and Denise Dimacale both declare that they each filed IRS Form 709 Gift Tax Returns reporting the amount of the gift that each gave to Nicole (as beneficiary) when the Property was transferred to the Trust in 1997. (Ex. 54 to Denise Decl.; Ex. 65 to Daniel Decl.)

### 5. IRS Additional Tax Liability for Year 1996

On October 17, 1997, Daniel and Denise Dimacale filed their joint U.S. Individual Income Tax Return (Form 1040) for tax year 1996 (SUF 19), in which they reported taxable income of $315,960, and a tax liability of $105,280 (SUF 20–21). They later admitted when they stipulated to the entry of the Tax Court

decision that they understated their taxable income by $1,596,219 and underreported their tax liability by $637,361.  (SUF 22–23.)  However, they partially dispute the fact that they underreported these numbers: they admit that they under reported the numbers when they stipulated to the entry of the Tax Court decision but deny that the admission was factually correct.  (Statement of General Disputes ("SGD") 22–23 – Dkt. No. 81-1.)

On November 30, 2001, The IRS issued a statutory notice of income tax deficiency to the Dimacales for tax years 1996 and 1997, and on March 13, 2002, they filed a petition in the United States Tax Court for a redetermination of their tax liabilities.  (SUF 24-25.)  On July 18, 2002, a quitclaim deed was recorded transferring the Property from Felicisima Reyes, as trustee of the Trust, to Denise Dimacale as trustee for the Trust.  (SUF 26.)

### 6. Mortgage Application with Kastlepoint Mortgage

Two months later, in September of 2002, Denise Dimacale applied for a loan with Kastlepoint Mortgage Inc.  (SUF 27.)  Denise Dimacale was listed as the borrower, her present address was listed as the Property securing the loan, and a box was checked indicating that she had owned the Property for six years.  (SUF 28–30.)  Assets were listed totaling $1,504,200 (including $1,400,000 for the value of the Property) and Total Liabilities of $641,626, including the existing mortgage on the Property of $537,112.  (SUF 31–32.)  Denise Dimacale signed the September Loan Application on October 2, 2002.  However, she ultimately did not obtain a loan from Kastlepoint.  (SUF 33.)

### 7. Mortgage to Refinance the Property

On December 12, 2002, Denise Dimacale signed a Uniform Residential Loan Application (Saxon Loan Application) to apply for a loan of $850,000.  (SUF 34.)  Denise Dimacale was listed as the borrower, her present address was

listed as the Property, and a box was checked indicating that she had owned the Property for six years.  (SUF 35–37.)  The only asset listed was the Property valued at $1,400,000.  (SUF 38.)  Liabilities were listed totaling $77,152 in revolving credit and installment liabilities.  (SUF 39.)  However, in the section titled "Details of Transaction," $754,773 was listed for the refinance, including debts to be paid off.  (SUF 40.)

The loan for $850,000 was funded by Saxon Mortgage.  (SUF 41.)  On December 19, 2002, a grant deed was recorded transferring the Property from Denise Dimacale, as trustee of the Trust, to Denise Dimacale as her sole and separate Property.  (SUF 42.)  Denise and Daniel Dimacale partially dispute this fact: they admit that the grant deed was recorded on December 19, 2002, but state that instead of transferring the property, the Deed transferred "bare legal title only."  (SGD 42.)  The same day, a Deed of Trust was recorded for the benefit of Saxon Mortgage, secured by the Property. (SUF 43.)  On December 20, 2002, a grant deed was recorded granting the Property from Denise Dimacale to Denise Dimacale, as trustee for the Trust.  (SUF 44.)  Denise and Daniel Dimacale partially dispute this fact: they admit that the Grant Deed was recorded on December 20, 2002, but state that instead of transferring the property, it "transferred bare legal title only."  (SGD 44.)

Denise Dimacale declared that some personal debts were paid with the loan proceeds in connection with the refinancing, which she states were likely required by the lender as part of the refinancing process.  (Denise Decl. ¶ 34.)

### 8.  CIT Loan for $100,000 Line of Credit

On or about December 20, 2002, Denise and Daniel Dimacale signed a Uniform Residential Loan Application (CIT Loan Application) to apply for a $100,000 line of credit with The CIT Group.  (SUF 45.)  Denise Dimacale was listed as the borrower, her present address was listed as the Property, and a box

was checked indicating that she owned the Property for 6 years.  (SUF 46–48.)
Daniel Dimacale was listed as the co-borrower.  (SUF 49.)  In the section titled
"Liabilities" the total unpaid balance was $910,171 (including the Saxon
Mortgage of $850,00).  (SUF 50.)  In the section titled "Assets", the only assets
listed were two Washington Mutual accounts totaling $6,200.  (SUF 51.)  The
section titled "Schedule of Real Estate Owned" listed the Property.  (SUF 52.)

On January 6, 2003, an Interspousal Transfer Grant Deed was recorded
purporting to transfer any interest of Daniel Dimacale to Denise Dimacale.  (SUF
53.)  Denise and Daniel Dimacale partially dispute this fact: they do not dispute
that the Deed was recorded on January 6, 2003, but they state that the Deed
merely transferred "bare legal title."  (SGD 53.)  On March 14, 2003, a Grant
Deed was recorded transferring the Property from Denise Dimacale, as trustee for
the Trust, to Denise and Daniel Dimacale, as husband and wife as joint tenants.
(SUF 54.)  Denise and Daniel state that this only transferred "bare legal title."  On
March 14, 2003, a Deed of Trust was recorded for the benefit of the CIT
Group/Consumer Finance, Inc., secured by the Property.  (SUF 55.)  The Deed of
Trust secured a "home equity line of credit" ("HELOC") on the Property in favor
of Denise and Daniel Dimacale in the amount of $100,000.  (SUF 56.)

Denise and Daniel Dimacale declare that they intended for the Trust to
remain the true owner of the Property at all times.  (Daniel Decl. ¶ 29; Denise
Decl. ¶ 37.)  They further declare that their loan officer was made aware of their
intention for the trust to remain the true owner of the Property and guided them
through the process including what documents had to be recorded to effectuate the
line of credit.  (Daniel Decl. at ¶28; Denise Decl. at ¶36; Arocho Decl. at ¶ 9–10.)
The line of credit was used to pay for improvements and expenses related to the
Property.  (*See* Daniel Decl. at ¶30; Denise Decl. at ¶38.)

### 9.  Stipulated Decision in Tax Court

Denise and Daniel Dimacale declare that they were unaware of any potential problems with their income tax returns for the years 1996 or 1997 at the time those returns were filed.  (Denise Decl. at ¶35; Daniel Decl. at ¶18-20, 36.) After the IRS audited the 1996 and 1997 returns and asserted that they owed money to the IRS, they hired an attorney, to advise them on the money they allegedly owed.  (Denise Decl. at ¶39; Daniel Decl. at ¶32.)  Their attorney filed a tax court petition on their behalf and then advised them to concede the tax court case and handle the debt through an offer in compromise or bankruptcy, without determining whether the IRS made any mistakes in the audit.   (Denise Decl. at ¶39-43; Daniel Decl. at ¶32-35.)

On April 1, 2003, the tax court entered a stipulated Decision for tax year 1996 which established a deficiency in Denise and Daniel Dimacale's 1996 income taxes in the amount of $637,361.88 plus an accuracy-related penalty pursuant to 26 U.S.C. § 6662(a) in the amount of $76,483.42.  (SUF 57–58.) Denise and Daniel Dimacale partially dispute this fact: they do not dispute that the decision established the deficiency and penalty; however, they dispute that the deficiency and penalty are "factually accurate."  (SGD 58.)

### 10. Transfer Back to Trust

On April 23, 2003, a quitclaim deed was recorded transferring the Property from the Daniel and Denise Dimacale to Denise Dimacale as her sole and separate property.  (SUF 59.)  Daniel and Denise Dimacale partially dispute this fact on the grounds that only "bare legal title" was transferred.  (SGD 59.)  The same day, a quitclaim deed was recorded transferring the Property from Denise Dimacale to Denise Dimacale as trustee of the Trust.  (SUF 60.)  Again, Daniel and Denise Dimacale claim that only "bare legal title" was transferred.  (SGD 60.)

**11. Assessment of Income Tax Liability for Tax Year 1996**

On September 8, 2003, the IRS assessed the additional tax and penalty

for tax year 1996 pursuant to the stipulated Tax Court Decision.  (SUF 64.)  On

April 6, 2004, the IRS recorded a notice of federal tax lien (NFTL) against Daniel

and Denise Dimacale with the Orange County Recorder's Office for tax year

1996.  (SUF 65.)  On October 12, 2004, a quitclaim deed was recorded

transferring the Property from Denise Dimacale, as trustee of the Trust, to

Felicisima Reyes, as trustee of the Trust.  (SUF 66.)

**12. Bankruptcy Proceedings**

Daniel Dimacale filed a voluntary Chapter 7 bankruptcy petition on March

15, 2005. (Daniel Decl. at ¶ 37.)  He listed the IRS as a creditor on Schedule E of

his chapter 7 bankruptcy case.  (Daniel Decl. at ¶ 37.)  The personal income tax

liabilities assessed against him for tax years 1996 and 1997 were discharged in his

Chapter 7 bankruptcy.  (SUF 82.)

On July 28, 2005, the Chapter 7 trustee in Daniel Dimacale's bankruptcy

filed an adversary proceeding seeking to set aside the transfer of the Property held

by the Trust ("Adversary Complaint").  (*See* Ex. A RFA Response No. 305 and

Ex. B RFA Response No. 305 to Taylor Decl;  Denise Decl. ¶ 44 and Ex. 62.)  On

June 13, 2006, the parties entered into a Stipulation re: Dismissal of Adversary

Proceeding.  (*See* Ex. 63 attached to Denise Decl.)  The Adversary Complaint was

dismissed with prejudice by court order entered on June 13, 2006.  (Denise Decl.

¶44 and Ex. 64.)

**13. Tax Liabilities Reduced to Judgment**

On September 21, 2012, the United States filed suit against Denise

Dimacale to reduce the tax assessments to judgment, which was assigned to this

Court.  (SUF 67.)  On January 6, 2014, the Court entered an order against Denise

Dimacale which reduced to judgment her income tax liability for tax year 1996 in the amount of $1,901,763.57 as of September 18, 2012.  (SUF 68.)  On July 17, 2014, the Court entered judgment on the tax liability for tax year 1996 which erroneously listed tax year 2006 instead of 1996.  (SUF 72.)  The United States recorded an abstract of judgment based on the Judgment.  (SUF 70.)

**14. Re-Recorded NFTL**

The notice of federal tax lien recorded April 6, 2004, provided that "unless notice of the lien is refiled by [October 8, 2013] this notice shall, on the day following such date, operate as a certificate of release as defined in IRC 6325(a)." (SUF 73.)  The IRS failed to refile the NFTL by October 8, 2013.   (SUF 74.)  On September 16, 2015, the IRS recorded a Revocation of Certificate of Release of Federal Tax Lien regarding Denise and Daniel Dimacale for tax year 1996.  (SUF 75.)  Denise and Daniel Dimacale partially dispute this fact: they do not dispute that the IRS recorded the document on September 16, 2015; however, they dispute whether the document was effective as a revocation of release.  (SGD 75.)

On October 15, 2015, a quitclaim deed was recorded transferring the Property from Felicisima Reyes, as trustee of the Trust to Nicole Dimacale as trustee of the Trust.  (SUF 77.)

On September 13, 2018, the IRS recorded a notice of federal tax lien against Denise Dimacale for tax year 1996.  (SUF 80.)  On December 13, 2019, the IRS recorded another notice of federal tax lien against Denise for tax year 1996 to make clear that the lien "does not attach to any property of the kind specified in 11 U.S.C. § 541(a)(2) that was acquired after the commencement of the bankruptcy case of Daniel Dimacale on March 15, 2005 and subject to the discharge in 11 U.S.C. § 524(a)(3)."  (SUF 81–82.)

**15. Balance Due from Denise**

As of August 10, 2020, the balance due from Denise Dimacale was
$2,505,817.25 for tax year 1996.  (SUF 83.)  Denise and Daniel Dimacale partially
dispute this fact: they do not dispute that the IRS database reflects such a balance;
however, they dispute that the amount owed is "factually accurate."  (SGD 83.)

**16. Operative Complaint and Motion**

The First Amended Complaint (Dkt. No. 64) — the operative Complaint —
alleges two claims: (1) foreclosure of the federal tax liens against the property;
and (2) set aside fraudulent transfer.  The United States moves for summary
judgment on both claims.  (Mot. – Dkt. No. 77.)

## II.    STATEMENT OF THE LAW

On a motion for summary judgment, the Court must determine whether,
viewing the evidence in the light most favorable to the nonmoving party, there are
any genuine issues of material fact.  *Simo v. Union of Needletrades, Indus. &
Textile Employees*, 322 F.3d 602, 609-10 (9th Cir. 2003); Fed. R. Civ. P. 56.
Summary judgment against a party is appropriate when the pleadings, depositions,
answers to interrogatories, and admissions on file, together with the affidavits, if
any, show that there is no genuine issue as to any material fact and that the
moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  A
factual dispute is "material" only if it might affect the outcome of the suit under
governing law.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  An
issue is "genuine" only if there is a sufficient evidentiary basis on which a
reasonable jury could find for the non-moving party.  *Id*. at 249.  The evidence
presented by the parties must be admissible.  Fed. R. Civ. P. 56(e).  In judging
evidence at the summary judgment stage, the Court does not make credibility
determinations or weigh conflicting evidence.  *T.W. Elec. Serv., Inc. v. Pac. Elec.*

*Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  Rather, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [the nonmovant's] favor."  *Anderson*, 477 U.S. at 255.  But the non-moving party must come forward with more than "the mere existence of a scintilla of evidence." *Id*. at 252.

# III.    DISCUSSION

## 1.  Requests for Judicial Notice ("RJN")

Defendants Denise and Daniel request that the Court take judicial notice of four documents from Daniel's bankruptcy proceedings:

(1) Daniel Dimacale Chapter 7 bankruptcy filing (Case No. 8:05-bk-11530-ES) (Dkt. No. 1 – March 15, 2005);

(2) Daniel Dimacale bankruptcy discharge (Case No. 8:05-bk-11530-ES) (Dkt. No. 39 – June 27, 2005).

(3) Bankruptcy Trustee's adversary complaint to avoid and recover fraudulent transfers (Case No. 8:05-ap-013370-ES) (Dkt. No. 1 – July 28, 2005);

(4) Stipulation for dismissal of adversary proceeding and order dismissing the case (Case No. 8:05-ap-013370-ES) (Dkt. No. 13 – June 9, 2006).

The Court grants the request because (1) the documents are relevant to this case, (2) documents from other Court proceedings are the type of documents courts typically judicially notice, and (3) the documents otherwise comply with Federal Rule of Evidence 201.

## 2. Res Judicata (Claim Preclusion)

Denise and Daniel Dimacale contend that the United States' Motion should be denied on the grounds that the claims are barred by res judicata (claim preclusion).

To bar a later suit under the doctrine of res judicata, an adjudication must:

(1) involve the same claim as the later suit, (2) have reached a final judgment on the merits, and (3) involve the same parties or their privies. *Prezio v. Bank of Am. Corp.*, 2015 WL 12745800, at *3 (C.D. Cal. Mar. 12, 2015), aff'd, 675 F. App'x 652 (9th Cir. 2017); *Stewart v. U.S. Bancorp*, 297 F.3d 953, 956 (9th Cir. 2002). The Ninth Circuit applies a four-factor test to determine if a later claim has a concurrence of identity with a previous claim: (1) whether the two suits arise out of the same transactional nucleus of facts; (2) whether rights or interests established in the prior judgment would be destroyed or impaired by prosecution of the second action; (3) whether the two suits involve infringement of the same right; and (4) whether the evidence presentenced in the two actions is substantially the same. *Mpoyo v. Litton Electro-Optical Sys.*, 430 F.3d 985, 987 (9th Cir. 2005). The "transactional nucleus" is the most important factor. *United States v. Liquidators of Eur. Fed. Credit Bank*, 630 F.3d 1139, 1151 (9th Cir. 2011). Whether two suits arise out of the same transactional nucleus depends upon whether they are related to the same set of facts and whether they could conveniently be tried together. *Turtle Island Restoration Network v. U.S. Dep't of State*, 673 F.3d 914, 918. (9th Cir. 2012). Generally, in analyzing the "transactional nucleus of facts," courts look to whether the claim at issue could have been brought in the previous action. *United States v. Liquidators of Eur. Fed. Credit Bank*, 630 F.3d 1139, 1151 (9th Cir. 2011).

### 1.1. Same Cause of Action

Daniel and Denise Dimacale contend that this lawsuit constitutes the same cause of action as the Chapter 7 Trustee's adversarial proceeding because the proceeding attempted to reach the entire property, owned by the Trust, for the benefit of creditors, and because the relief sought here — the recovery and sale of the property to pay creditors (the IRS) — is the same in both cases. Furthermore, Daniel and Denise Dimacale contend that the earlier case arose out of the same transactional nucleus of facts, namely the transfer of the Property from Denise and

1    Daniel Dimacale to the Trust and the subsequent refinancing of the Property.

2    Finally, Daniel and Denise Dimacale contend that the evidence is the same in both

3    cases, and that the rights established by the dismissal with prejudice of the earlier

4    action would be impaired by the prosecution of the present action.

5        In the prior bankruptcy case, however, the Chapter 7 Trustee filed the

6    adversary proceeding seeking to set aside the transfer of the property held by the

7    Trust.  The Trustee challenged the transfer from Daniel Dimacale to Denise

8    Dimacale, and subsequent transfers, asserting that Daniel Dimacale was the owner

9    of the property based on his actions and intentions.  In contrast, in the instant

10   action the United States seeks to foreclose on federal tax liens attached to real

11   property owned by Denise Dimacale to collect delinquent taxes.  Furthermore,

12   unlike the fraudulent transfer claim alleged by the Chapter 7 Trustee, the United

13   States alleges a separate claim, namely that Denise Dimacale's tax lien attaches to

14   all her property (including the property which is held by the Trust as her

15   nominee).  The nominee claim involves different facts, such as Denise Dimacale's

16   relationship to the trustee of the Trust and her continual enjoyment of the benefits

17   of the property.  The Court thus finds that this case does not arise out of the same

18   transactional nucleus of facts as the adversary proceeding.

19       Additionally, the United States does not challenge the conclusion that

20   Daniel Dimacale has no right to the property.  Thus, the Court finds that the result

21   of the adversary proceeding would not be impaired or otherwise infringed by a

22   finding in this case that Denise Dimacale is the owner of the property.

23       Accordingly, the Court finds that the causes of action in this case are

24   different than the causes of action in the previous adversary proceeding brought by

25   the Chapter 7 Trustee.

26   **1.2. Final Judgment on the Merits**

27       Denise and Daniel Dimacale contend that the Chapter 7 Trustee's earlier

28   suit constituted a final disposition on the merits because a dismissal with prejudice

14

is a final resolution for purposes of res judicata. *See Const. Indus. Pension, Welfare & Training Tr. Funds v. Karr*, 994 F.2d 1426, 1429 (9th Cir. 1993). The United States does not dispute this factor. The Court finds that this factor is met.

### 1.3. Identical Parties or Privies

Denise and Daniel Dimacale do not dispute that the United States was not a party to the adversary proceeding. Instead, they contend that there was privity between the IRS (which the United States represents here) as a creditor in this case and the Chapter 7 Trustee in the adversarial proceeding. They cite to the following authority provided by the Third Circuit in *Artesanias Hacienda Real S.A. de C.V. v. North Mill Capital, LLC (In re Wilton Armetale, Inc.)*:

> When a debtor declares bankruptcy, most of its property gets transferred to its estate. c11 U.S.C. § 541. The estate encompasses "all kinds of property, including . . . causes of action." *Bd. of Trs. of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 169 (3d Cir. 2002) (quoting *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 n.9, 103 S. Ct. 2309, 76 L. Ed. 2d 515 (1983)); see 11 U.S.C. § 541(a)(1). "A cause of action [becomes] property of the estate if the claim existed at the commencement of the [bankruptcy] filing and the debtor could have asserted the claim on his own behalf under state law." *Foodtown*, 296 F.3d at 169 n.5.
>
> A court-appointed bankruptcy trustee manages the estate's property, including those causes of action. The trustee "is the representative of the estate" with the "capacity to sue and be sued" on its behalf. 11 U.S.C. § 323(a), (b). So once a cause of action becomes the estate's property, the Bankruptcy Code gives the trustee, and only the trustee, the statutory authority to pursue it.

968 F.3d 273 (3rd Cir. 2020). Based on this case, Daniel and Denise Dimacale contend that, upon Daniel Dimacale's filing of a Chapter 7 bankruptcy case, only the Chapter 7 Trustee could pursue an action against the Trust to recover the Property, and thus the IRS's recordation of the nominee lien notice against the Property was improper as a violation of the automatic stay imposed by Section 362(a) of the Bankruptcy Code. They further contend that the Chapter 7 Trustee "directly represented" the interests of the IRS as a creditor, and thus there is privity between the Chapter 7 Trustee and the IRS.

The United States contends that the IRS and the Chapter 7 Trustee are different parties. It cites to *In Re Shuman*, in which the Bankruptcy Appeal Panel of the Ninth Circuit recognized that a bankruptcy trustee cannot be a "virtual representative" of any sole creditor or the debtor because of their different interests. *See In re Shuman*, 78 B.R. 254, 256 (B.A.P. 9th Cir. 1987) (holding that a bankruptcy trustee is not in privity with a debtor or any single creditor in a bankruptcy case because the trustee has powers greater than any single creditor under 11 U.S.C. § 544); *see also In re Hunt*, 2015 WL 5749794 at *14 (Bankr. C.D. Cal. Sept. 30, 2015) (citing *Shuman*, 78 B.R. 254) (holding that there is no privity between a bankruptcy trustee and a debtor). Moreover, "parallel legal interests alone, identical or otherwise, are not sufficient to establish privity." *Headwaters Inc. v. U.S. Forest Serv.*, 399 F.3d 1047, 1054 (9th Cir. 2005).

The Court finds that there is no privity between the Chapter 7 Trustee and the IRS because the cases that the United States cites — all of which are from the Ninth Circuit — hold that there is no privity between a bankruptcy trustee and a debtor.

\*　　\*　　\*

In sum, the Court finds that res judicata does not bar the United States' claims because the claims and parties in this case are different than the claims and parties in the prior bankruptcy proceedings.

### 3. Validity of the IRS Lien

Denise and Daniel contend that the Motion should be denied because the United States has failed to prove that it has a valid lien against Denise.

When the United States files a notice of federal tax lien, it states in part that unless a notice of lien is refiled by a specific date, the lien self-releases. 26 U.S.C.

§ 6325.  In this case, the IRS filed a notice of federal tax lien asserting that the property was held by the NCD Qualified Personal Residence Trust as nominee of Denise Dimacale but did not refile the notice before it expired and the lien self-released.  To reinstate the lien, the IRS must file notice of revocation with the County Recorder and mail a copy of the notice to the taxpayer. 26 U.S.C. § 6325(f)(2).

Denise and Daniel Dimacale contend that the IRS did not properly revoke the lien releases because there is no evidence that the IRS sent a copy of the second Revocation (the Nominee Revocation) to the taxpayer's last known address.  Thus, Denise and Daniel Dimacale conclude that there is no IRS lien against Denise which can be foreclosed.

The United States contends that it is entitled to a presumption that the Revenue Officer properly discharged his official duty and sent the notice of revocation. The presumption is known as the presumption of regularity or the presumption of correctness.  *See United States v. Chem. Found*., 272 U.S. 1, 14-15 (1926).  The presumption of regularity applies to tax collection efforts of the IRS when there is minimal evidence that shows compliance with statutory requirements.  *See Palmer v. U.S. I.R.S.*, 116 F.3d 1309, 1311 (9th Cir. 1997) (presumption of regularity for tax collection actions); *see also Sequoia Prop. & Equip., Ltd. P'ship v. United States*, 100 F. App'x 638 (9th Cir. 2004) (same).  In *United States v. Harvey*, the taxpayers argued that they never received notice of a revocation of a certificate of release under 26 U.S.C. § 6325(f)(2). 2017 WL 4220010 (D. Idaho Sept. 22, 2017), aff'd, 738 F. App'x 469 (9th Cir. 2018), and order clarified, 2020 WL 5658347 (D. Idaho Sept. 23, 2020).  The court in *Harvey* found that the IRS's records were entitled to a "presumption of validity" and found that the revocation was not invalid. *Id*.

Here, there is no dispute that the IRS recorded the notice of revocation and that it was required to send notice to Denise Dimacale. (SUF 75–79.)  Thus, based

on the presumption of regularity, and the absence of any proof to the contrary, the Court finds that the notice of revocation was sent and that the tax lien was reinstated.

Accordingly, the Court finds that there is a valid IRS tax lien against Denise Dimacale.

### 4. Foreclosure of Federal Tax Liens Against the Property (Claim One)

The United States moves for summary judgment on its first claim for foreclosure of the IRS's tax lien against the Property on the grounds that the Property was held by the Trust as a nominee in regard to two transactions completed in 2002 and 2003.

A lien for unpaid tax liabilities arises in favor of the United States against all property and rights to property owned by the taxpayer as of the assessment date.  26 U.S.C. §§ 6321, 6322.  The Supreme Court has held that the statutory language governing tax liens "is broad and reveals on its face that Congress meant to reach every interest in property that a taxpayer might have." *United States v. Nat'l Bank of Commerce*, 472 U.S. 713, 719–20 (1985); *see also Drye v. United States*, 528 U.S. 49, 56 (1999).  Thus, 26 U.S.C. § 6321 extends "not only [to] the property and rights to property owned by the delinquent taxpayer, but also property held by a third party if it is determined that the third party is holding the property as a nominee or alter ego of the delinquent taxpayer." *Spotts v. United States*, 429 F.3d 248, 251 (6th Cir. 2005).  "Among the property interests reached by section 6321 is an equitable interest owned by or for the benefit of a taxpayer in property titled in the name of a nominee." *Criner v. Commissioner*, T.C. Memo. 2003-328 at *9, 2003 WL 22843085 (Nov. 25, 2003) (citing *G.M. Leasing Corp. v. United States*, 429 U.S. 338, 350-51 (1977); *United States v. Miller Bros. Constr. Co*., 505 F.2d 1031 (10th Cir. 1974)).

### 4.1. Nominee Doctrine

The nominee doctrine is an equitable device to prevent debtors or taxpayers from evading liability by shielding property from collection through fake transfers of the property to another entity. *Prompt Staffing, Inc. v. United States*, 321 F. Supp. 3d 1157, 1170 (C.D. Cal. 2018) (citation omitted). When a debtor transfers property to another entity, but continues to exercise ownership over that property, the law treats the debtor as the true owner of the property for liability purposes. *Id*. (citations omitted). The nominee doctrine addresses the relationship between the taxpayer and the property sought to be accessed. *Id*. It asks whether the taxpayer treats the property as his own and enjoys the benefits of true ownership even though another entity holds legal title. *Id*. (citing *Fourth Inv. LP v. United States*, 720 F.3d 1058, 1066 (9th Cir. 2013) (holding that "[a] nominee is one who holds bare legal title to property for the benefit of another."))

The nominee doctrine requires the application of federal and state common law. *Id*. at 1170–71. State law creates the property right and federal law attaches consequences to that property right. *Id*. at 1171 (citing *United States v. Craft*, 535 U.S. 274, 278 (2002)). When attaching a tax lien to property, a court's analysis requires two steps. First, the court looks to state law to determine what rights the taxpayer has in the property the Government seeks to reach. *Id*. Second, if the court determines that the taxpayer has a property interest under state law, it then looks to federal law to determine whether the taxpayer's state-delineated rights qualify as property or rights to property within the compass of the federal tax lien legislation. *Id*.

In determining whether taxpayers hold property rights to which a tax lien may attach, the District Court must look to state law. *United States v. Craft*, 535 U.S. 274, 278 (2002) (the federal tax lien statute attaches federal consequences to rights created under state law); *Drye v. United States*, 528 U.S. 49, 58 (1999) (state law determines what rights a taxpayer has in property; then federal law

19

determines whether those rights qualify as property sufficient for a lien to attach under 26 U.S.C. § 6321);  *Aquilino v. United States*, 363 U.S. 509, 513 (1960).

The Ninth Circuit has held that "California law recognizes a nominee theory of property ownership." *Fourth Inv. LP v. United States*, 720 F.3d at 1069. Furthermore, the Ninth Circuit has opined that "if the California Supreme Court had occasion to evaluate the factors relevant to determining nominee ownership under California law, it would adopt the uniform set of factors generally recognized by federal courts." *Id*.  The following six factors are considered when evaluating whether property is held by a nominee:

(1) Whether inadequate or no consideration was paid by the nominee;

(2) Whether the properties were placed in the nominee's name in anticipation of a lawsuit or other liability while the transferor remains in control of the property;

(3) Whether there is a close relationship between the nominee and the transferor;

(4) Failure to record the conveyances;

(5) Whether the transferor retained possession; and

(6) Whether the transferor continues to enjoy the benefits of the transferred property.

*Id.* at 1070.  *See also Towe Antique Ford Found. v. IRS*, 999 F.2d 1387, 1391 (9th Cir. 1993).  Moreover, the Court "must give particularly close scrutiny to the facts" when there are family members on both sides of the transfer.  *Caligiuri v. Commissioner*, 549 F.2d 1155, 1157 (8th Cir. 1977) (analyzing intra-family debt); *Estate of Schuler v. Commissioner*, 282 F.3d 575, 579 (8th Cir. 2002) (intrafamily transfers demand "close scrutiny" precisely because the genuineness of the transaction cannot reasonably be inferred from assurances from the taxpayer).

Here, the United States moves for summary judgment on the grounds that the undisputed facts and evidence show that the Trust held the property as a

nominee for Denise based on the six factors, and thus it is entitled to foreclose on the property.  The parties do not dispute that Denise and Daniel Dimacale transferred the property to the Trust and retained physical possession of the property, that Felicisima Reyes is a relative of the Dimacales, or that Denise and Danile made several transfers that were properly recorded.  Furthermore, the United States provided evidence showing various conveyances which transferred ownership of the Property between the Trust and Daniel and Denise.  (See Pls.' Exs. A14, A80, A17, A83, A84, A19, A93, A20, A94.)  However, Defendants provided the declarations of Daniel and Denise Dimacale, in which they each declared that they believed they were able to retain possession of the property after transferring it to the trust under the terms of the QPRT trust, that they intended the Trust to remain the true owner of the property, and that any transfers were for bare legal title only.  (*See* Denise Decl. ¶ 15-39; Daniel Decl. ¶ 19-32.) Furthermore, Defendants provided the declaration of Raymond Arocho, who declared that he advised the Dimacales that in order to refinance the mortgage on the Property, they would need to temporarily transfer the bare legal title of the Property to themselves.  (Declaration of Raymond Arocho ("Arocho Decl.") ¶ 3.) The Court thus finds that the evidence provided by the parties creates a genuine dispute of material fact as to the nominee doctrine, including whether the transfers were fake and whether the taxpayers transferred property for the purpose of evading liability.  (*See* Denise Decl., Daniel Decl., and Arocho Decl.)

Accordingly, the Court denies the United States' motion for summary judgment as to the first claim.

### 5.  Set Aside Fraudulent Transfer (Claim Two)

The United States' second claim for fraudulent transfer alleges that the transfer of the Property from Denise and Daniel to the Trust on April 23, 2003 constituted a fraudulent transfer under Cal. Civ. Code § 3439.04(a)(1) because the

transfer was made with actual intent to hinder, delay, or defraud the United States. The United States moves for summary judgment on this claim.

A fraudulent transfer may be avoided to the extent necessary to satisfy a creditor's claim. Cal. Civ. Code § 3439.07(a)(1). A transfer made by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made, if the debtor made the transfer with actual intent to hinder, delay, or defraud any creditor of the debtor. Cal. Civ. Code § 3439.04(a)(1). In determining actual intent, the court may consider the following non-exclusive list of factors:

> (1) Whether the transfer or obligation was to an insider.
> (2) Whether the debtor retained possession or control of the property transferred after the transfer.
> (3) Whether the transfer or obligation was disclosed or concealed.
> (4) Whether before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.
> (5) Whether the transfer was of substantially all the debtor's assets.
> (6) Whether the debtor absconded.
> (7) Whether the debtor removed or concealed assets.
> (8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.
> (9) Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.
> (10) Whether the transfer occurred shortly before or shortly after a substantial debt was incurred.
> (11) Whether the debtor transferred the essential assets of the business to a lienor that transferred the assets to an insider of the debtor.

Cal. Civ. Code § 3439.04(b). In California, the burden is on the plaintiff to establish "actual intent" by a preponderance of the evidence. *Liodas v. Sahadi*, 19 Cal. 3d 278, 137 Cal. Rptr. 635 (1977). Actual intent is established from the circumstances surrounding the transfer of the assets involved. *Menick v. Goldy*, 131 Cal. App. 2d 542 (1955). As with the nominee analysis, because there are family members on both sides of the transfer, the Court "must give particularly close scrutiny to the facts." *Caligiuri v. Commissioner*, 549 F.2d 1155, 1157 (8th Cir. 1977).

The Court finds that the evidence provided by the parties creates a genuine dispute of material fact as to whether the transfers were fraudulent. (*See* Denise Decl., Daniel Decl., and Arocho Decl.)

*       *       *

Therefore, the Court denies the United States' Motion for Summary Judgment as to the second claim.

## IV.  CONCLUSION

Accordingly, the Court **DENIES** Plaintiff's Motion for Summary Judgment as to both the first and second claims.

**IT IS SO ORDERED.**

DATED:  NOVEMBER 22, 2022.    _____
                              CONSUELO B. MARSHALL
                              UNITED STATES DISTRICT JUDGE