DAVID J. WARNER (Cal. Bar No. 261718)
dwarner@hsdtaxlaw.com
**HOLTZ, SLAVETT & DRABKIN, APLC**
10940 Wilshire Boulevard, Suite 2000
Los Angeles, CA 90024
Telephone: (310) 550-6200
Fax: (310) 774-3904

Attorney for Defendants Nicole Dimacale, as an individual, and Nicole Dimacale, as the trustee of the NCD Qualified Personal Residence Trust

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| United States of America, Plaintiff, v. Denise Dimacale, et al., Defendants. ——————————— And related Cross and Counterclaim Actions | Case No. 2:21-cv-06012-CBM-RAO<br><br>Defendant Nicole Dimacale's Memorandum of Contentions of Fact and Law<br><br>Hon. Consuelo B. Marshall<br>Courtroom 8D<br><br>**Pretrial Conference**:<br>Date: March 7, 2023<br>Time: 2:30 p.m.<br><br>**Trial (Est. 2 Days) Beginning**:<br>Date: April 4, 2023<br>Time: 10:00 a.m. |

Pursuant to Local Rule 16-4, Defendants Nicole Dimacale, as an individual, and Nicole Dimacale, as the trustee ("Trustee") of the NCD Qualified Personal Residence Trust (the "Trust") (collectively, the "Nicole Defendants") respectfully submit the following Memorandum of Contention of Fact and Law as to this action by the United States of America ("Plaintiff") against defendants Denise Dimacale ("Denise"), et al. The Trustee, as trustee of the Trust, owns certain real property located in Newport Beach, California (the "Property"). Plaintiff alleges that (1) the Trust is the nominee of Denise, or (2) Denise made a fraudulent transfer when she refinanced the mortgage secured by

the Property to get a lower interest rate.  For the reasons stated herein and to be proven at trial, the Trustee, as trustee of the Trust, is the true owner of the Property, the Trust is not a nominee of Denise, and there was no fraudulent transfer related to the Property.  As such, the Court should deny in full Plaintiff's requested relief.

## I.   PLAINTIFF'S CLAIMS

### A.   Plaintiff's Claim #1: Alleged Nominee and Lien Foreclosure

**Claim 1**:     The Trust is the nominee of Denise, the federal tax lien of the Internal Revenue Service ("IRS") attaches to Denise's interest in the Property, and the Court should foreclose on the IRS's lien.

**Elements for Claim 1**:   For this claim, Plaintiff must prove the following elements:

1.  The Trust is the nominee of Denise; and
2.  Denise has an ownership interest in the Property based on the nominee theory of ownership;

**Burden of Proof for Claim 1**:  Plaintiff must establish each of the two elements for Claim 1 by a preponderance of the evidence.

**Summary of the Law for Claim 1**:  The IRS's federal tax lien attaches to all property and rights to property of the taxpayer.  26 U.S.C. (I.R.C.) § 6321.  Under a nominee theory of ownership, the IRS's federal tax lien can attach to property held in the name of a nominee for the benefit of the taxpayer.  *See Fourth Invest. LP v. United States*, 720 F.3d 1058 (9th Cir. 2013).  Courts applying California law often consider six factors to determine whether the taxpayer is the beneficial owner and a nominee situation

exists.  These factors are: (1) whether inadequate or no consideration was paid by nominee; (2) whether properties were placed in nominee's name in anticipation of a lawsuit or other liability while transferor remains in control of the property; (3) whether there is a close relationship between nominee and transferor; (4) failure to record the conveyances; (5) whether transferor retained possession; and (6) whether transferor continues to enjoy the benefits of the transferred property.  *See id.* at 1070.  The overall inquiry is about who is the beneficial owner of the property.  *See id.* at 1068.

The Property is owned by the Trustee, as trustee of the Trust, and the Trust is a qualified personal residence trust ("QPRT").  A QPRT is defined in Treas. Reg. § 25.2702-5(c).  The IRS's QPRT rules require that the transferor live in a personal residence for a defined term (usually a set number of years).  After that term, the trust terminates and distributes the personal residence to the beneficiary.  The IRS rules provide that to be a QPRT, the trust document must contain certain required terms.  *Id.* These terms include (but are not limited to) that (1) the trust must be irrevocable, (2) the trustor/transferor must use the residence as their personal residence during the trust term, and (2) the trust must only hold the personal residence.   *Id.*

The IRS QPRT regulations have been in place since 1992.  In 2003, the IRS drafted a sample declaration of trust (trust document) that meets the requirements of a QPRT.  *See* IRS Rev. Proc. 2003-42, 2003-1 C.B. 993.  The IRS revenue procedure specifically states that "[i]n order to qualify as a QPRT, the governing instrument must contain all the provisions required under the regulations."  *Id.*, section 5.01(1).

The IRS revenue procedure's sample trust declaration provides that the trustor "retains no right, title, or interest in any trust asset except as specifically provided in this trust instrument."  *Id.*, section 4.  In addition, during the term of the QPRT, the IRS's rules provide that "**the Transferor shall have the exclusive rent-free use, possession, and enjoyment of the Residence**."  *Id.* (emphasis added).  Lastly, the IRS rules state, "**The Transferor shall be responsible for the payment of all costs associated with the Residence**, including but not limited to mortgage payments, property taxes, utilities,

repairs, maintenance, and insurance." *Id.* (emphasis added).

As a part of transferring a personal residence into a QPRT, the trustor must file an IRS Form 709 gift tax return to report the interest transferred to the QPRT beneficiary. Specifically, at the end of the QPRT trust term, the beneficiary receives title to the personal residence and the trust terminates. The beneficiary's right to the property in the future is a present gift subject to U.S. gift tax in the year the QPRT is formed.

Creditors of a QPRT's settlor have attempted to reach real property held inside of a QPRT. There are three main cases in which courts have held that creditors **cannot** reach real property held in a QPRT: (1) *Seay v. Ferrante*, (2) *In re Earle*, and (3) *In re Yerushalmi*.[1] Each of these three cases will be discussed below.

In *Seay v. Ferrante*, case no. G040346 (Cal. Ct. App. Mar. 27, 2009), a California Court of Appeal considered QPRTs under California law. In *Seay v. Ferrante*, a creditor of the QPRT's settlor attempted to collect from real property held in the QPRT. The California Court of Appeal rejected this attempt, stating that the QPRT is irrevocable and California law provides that a settlor's creditors cannot reach assets in an irrevocable trust. *See Laycock v. Hammer*, 141 Cal. App. 4th 25 (2006). In *Laycock* (quoted by the court in *Seay v. Ferrante*), the California Court of Appeals concluded, "[B]y expressly giving settlors' creditors the right to reach only the assets of revocable trusts, the Legislature . . . has clearly indicated an intention that creditors are to be bound by the

---

[1] In the case of *Ferrante v. Casey* (*In re Ferrante*), case no. CC-14-1222 (B.A.P. 9th Cir. Aug. 26, 2015), the bankruptcy appeal panel held in an unpublished opinion that the bankruptcy trustee could reach real property in the trust because the trust failed to qualify as a QPRT (the trust contained terms that violated the IRS rules). *Ferrante* is distinguishable from the facts of this case because the Trust in this case is a valid QPRT that complies with all IRS rules.

In another case, *Eldridge v. Eldridge*, 398 S.C. 112 (2012), the beneficiaries of a QPRT sued the trustee for breach of fiduciary duty, and the South Carolina Supreme Court agreed that the trustee breached his duty when he transferred the real property out of a QPRT.

terms of an irrevocable trust to the same extent settlors, beneficiaries and other claimants are bound by such an instrument." *Id.* at 31.

In *Premier Capital Funding Inc. v. Earle* (*In re Earle*), 307 B.R. 276 (Bankr. S.D. Ala. 2002), a bankruptcy court considered whether the bankruptcy trustee could reach real property held in a debtor's QPRT.  In *Earle*, the bankruptcy trustee alleged that the debtor had either fraudulently transferred the real property into the QPRT or that the QPRT was the debtor's alter ego.

The bankruptcy court in *Earle* disagreed with the trustee, holding that there was no fraudulent transfer upon the creation of the QPRT under Alabama's version of the uniform fraudulent transfers act.  *Id.* at 301.  The bankruptcy court in *Earle* focused on the IRS's QPRT rules, including (1) the fact that a federal agency (the IRS) prescribed the QPRT rules, (2) there was a completed gift to the QPRT beneficiary when the debtor settled the QPRT, (3) the real property is transferred from the QPRT to the trust beneficiaries upon completion of the trust term, and (4) the QPRT places restrictions on the use of the property during the trust term.  *Id.* at 291-92.  The bankruptcy court in *Earle* concluded about the QPRT, "A transfer may frustrate and/or incidentally affect a creditor, but that is not enough to prove fraud, particularly where there is a legitimate reason proven for the transfer.  Here, that reason was valid estate planning."  *Id.* at 296.

The case of *Pergament v. Yerushalmi* (*In re Yerushalmi*), 487 B.R. 98, 100 (Bankr. E.D.N.Y. 2012), also involved a QPRT settlor's creditors attempting to collect on real property held inside a QPRT.  The bankruptcy court in *Yerushalmi* rejected the request to "pierce" the QPRT under New York's alter ego theory, stating:

> While it is true the Debtor retained the use and enjoyment of the [the real property] after it was transferred to the QPRT and continued to pay all expenses associated with the [real property], **those facts are consistent with the requirements of a valid QPRT**. The grantor of a qualified personal residence trust retains the right to live at the residence rent free but has to pay all costs

associated with the residence for the duration of the trust
term . . . .

*Id.* at 111-12 (emphasis added).  The bankruptcy court in *Yerushalmi* found that the
debtor "did not engage in any conduct or enter into any transaction that would be
inconsistent with the QPRT's ownership of the property . . . ." *Id.* at 112.  Thus, the
bankruptcy trustee could not reach the property under a fraud or alter ego theory.

While nominee and alter ego theories of liability use different elements and factors,
they are based on a similar idea that while legal title of property is held in the name of
one person, beneficial ownership is held in the name of another.  In these three above
cases, courts all rejected attempts by creditors to claim that a QPRT's settlor is the
beneficial owner of QPRT assets.  Our office is not aware of (and Plaintiff has not cited)
any case in which a court considered a valid QPRT and determined that the QPRT was
the nominee of the settlor.  On the contrary, there are at least three cases (cited above) in
which courts have concluded that a settlor's creditors cannot reach real property held in a
QPRT.

**Nicole Defendants' Evidence in Opposition of Claim 1**:  The Nicole Defendants
will rely primarily on the testimony of Denise and Daniel Dimacale ("Daniel") and the
testimony of Denise and Daniel's estate planning attorney (Steven B. Kray) to show that
the Trust is not the nominee of Denise.  In particular:

- Denise and Daniel formed the Trust in August 1997 for estate planning purposes to
  provide for their (then 11-year-old) daughter.
- In August 1997, Denise and Daniel had no outstanding liabilities, other than minor
  credit card balances.
- In August 1997, Denise and Daniel owed no money to the IRS.
- In August 1997, Denise and Daniel correctly reported the value of the gift to their
  daughter on IRS Forms 709 U.S. gift tax returns.
- The Trust is an irrevocable trust.

- The Trust is a valid QPRT.
- The Trust so far has completed more than 25.5 years out of the 30-year trust term (more than 85% of the trust term).
- The Trust's term ends in less than 4.5 years in August 2027.
- In August 2027, the Trust will terminate under the terms of the Trust, and Nicole (as the beneficiary of the Trust) will own the Property.
- The Trust agreement states that it is a QPRT.
- The Trust agreement states that the Trust is irrevocable.
- The Trust agreement contained all IRS requirements for a valid QPRT.
- The Trust's settlors, trustees, and beneficiary all complied with the IRS's QPRT rules.
- The IRS QPRT rules require Denise and Daniel to live in the Property.
- The IRS QPRT rules require Denise and Daniel to live in the Property rent-free.
- The IRS QPRT rules require Denise and Daniel to pay all costs associated with the Property, including mortgage interest, property taxes, insurance, and basic repairs and maintenance expenses.
- Under the IRS QPRT rules, Nicole (as beneficiary) is the beneficial owner of the Property.
- The Trust is a grantor trust.
- As a grantor trust, the grantors (Denise and Daniel) may deduct the home mortgage interest paid by Denise and Daniel for the Property.
- The 2002 refinancing and 2003 HELOC transactions were done for the benefit of the Trust, the Property, and the Trust's beneficiary, Nicole.
- The Nicole Defendants incorporate by reference all facts identified below under Claim 2 regarding the 2002 refinancing and 2003 HELOC transactions.

///
///
///

**B.      Plaintiff's Claim #2: Alleged Fraudulent Transfer**

**Claim 2**:      Denise made a fraudulent transfer of the Property to the Trust in 2002 or 2003 when the mortgage secured by the Property was refinanced, and, as such, the court should set aside this transfer and hold that Denise is the owner of the Property.

Plaintiff bases its Claim 2 on two different provisions of the California Uniform Fraudulent Transfer Act: (a) actual intent, and (b) a transfer for less than fair value.

**Elements for Claim 2a**:  For a fraudulent transfer based on "actual intent" under Cal. Civ. Code § 3439.04(a)(1), Plaintiff has the burden to prove:

1. A transfer made by a debtor;
2. A creditor has a claim against the debtor that arose before or after the transfer was made; and
3. The debtor made the transfer with the actual intent to hinder, delay, or defraud the creditor.

**Elements for Claim 2b**:  For a fraudulent transfer based on a transfer for less than fair value under Cal. Civ. Code § 3439.04(a)(2)(B), Plaintiff has the burden to prove:

1. A transfer made by a debtor;
2. The debtor did not receive reasonably equivalent value in exchange for the transfer; and
3. The debtor intended to incur, or believed or reasonably should have believed that they would incur, debts beyond their ability to pay as they became due.

**Burden of Proof for Claim 2a and Claim 2b**:  Plaintiff must establish each of the three elements for Claim 2a or Claim 2b by a preponderance of the evidence.

///

///

**Summary of the Law for Claim 2a and Claim 2b**:  California Civil Code § 3439.04(a)(1) requires the party raising a fraudulent transfer prove "actual intent" to defraud creditors.  The California Civil Code codified 11 factors to use to determine whether there is actual intent to defraud.  *See* § 3439.04(b).  The 11 factors under California law are: (1) transfer to an insider, (2) debtor retained control of the property, (3) transfer disclosed or concealed, (4) threat of being sued, (5) transfer of substantially all debtor's assets, (6) whether debtor absconded, (7) debtor removed or concealed assets, (8) consideration received, (9) debtor was insolvent, (10) transfer before debt incurred, and (11) transferred essential business assets.  *Id.*

The Nicole Defendants are not aware of (and Plaintiff has not cited) any cases in which refinancing a mortgage to achieve a lower interest rate is a fraudulent transfer (a) with the "actual intent" to defraud creditors, or (b) for less than fair value with the intent to defraud creditors.

Furthermore, the IRS has ruled that mirrored transfers—one from *A* to *B* and the other is from *B* back to *A* can be reasonably equivalent consideration.  *See* IRS Rev. Rul. 59-505 (finding that reciprocal transfers are an exchange for consideration).

In addition, California law allows for the transfer of bare legal title without the transfer of beneficial ownership.  *See, e.g.*, *Parkmerced Co. v. San Francisco*, 149 Cal. App. 3d 1091 (1983).  In *Parkmerced*, bare legal title to real property was transferred from a corporation to a new corporation and then back to the original corporation as part of a merger.  The California Court of Appeal held that the transfer out and back to the original owner was a transfer of "bare legal title" whereas beneficial ownership stayed with the original corporation.  *Id.*  The corporations always intended for the first corporation to be the beneficial owner.  As such, the transfer of bare legal title was not a "transfer" that required reassessment of property taxes (the taxes at issue in *Parkmerced*).  *Id.*

///

///

**Nicole Defendant's Evidence in Opposition of Claim 2a and Claim 2b**:  The Nicole Defendants will rely primarily on the testimony of Denise and Daniel (her parents), the testimony of Denise and Daniel's estate planning attorney (Steven B. Kray), the testimony of Denise's loan officer for the HELOC refinance (Raymond Arocho), and the testimony of Samantha Kittle to show that the refinancing was not a fraudulent transfer.  In particular:

- Denise and Daniel purchased the Property in June 1996.
- Denise and Daniel formed the Trust in August 1997.
- Denise and Daniel formed the Trust for estate planning purposes to provide for their (then 11-year-old) daughter (Nicole).
- In August 1997, Denise and Daniel had no outstanding liabilities, other than minor credit card balances.
- In August 1997, Denise and Daniel owed no money to the IRS.
- In August 1997, the Property was placed in the Trust.
- Plaintiff does **not** assert that this initial transfer of the Property to the Trust in 1997 was a fraudulent transfer.
- Plaintiff does **not** assert that the Trust is a sham.
- In 1997, Denise and Daniel correctly reported the value of the gift to their daughter on IRS Forms 709 U.S. gift tax returns.
- Denise and Daniel only owned the Property in their name for 443 days before they transferred the Property into the Trust on August 20, 1997.
- From August 20, 1997, to the date of this memorandum, there have been 9,752 days.  Of those 9,752 days, bare legal title to the Property was held outside the Trust for a total of 41 days, as follows:

///
///
///
///

| Date | Title Holder Before | Title Holder After | # Days Owned | Days Bare Title Not in Trust |
|---|---|---|---|---|
| 6/3/1996 | Unrelated third party | Denise & Daniel | 443 | |
| 8/20/1997 | Denise & Daniel | Reyes (Trustee) | 1,793 | |
| 7/18/2002 | Reyes (Trustee) | Denise (Trustee) | 154 | |
| 12/19/2002 | Denise (Trustee) | Denise (Individual) | 1 | 1 |
| 12/20/2002 | Denise (Individual) | Denise (Trustee) | 84 | |
| 3/14/2003 | Denise (Trustee) | Daniel & Denise | 40 | 40 |
| 4/23/2003 | Daniel & Denise | Denise (Individual) | 0 | 0 |
| 4/23/2003 | Denise (Individual) | Denise (Trustee) | 538 | |
| 10/12/2004 | Denise (Trustee) | Reyes (Trustee) | 4,020 | |
| 10/15/2015 | Reyes (Trustee) | Nicole (Trustee) | 2,679 | |
| | | **Total Days** | **9,752** | **41** |

- After the Property was placed in Trust in 1997, bare legal title to the Property was held outside the Trust for a total of 41 days out of a total of 9,752 days through the date of the filing of this memorandum.  This equals 0.4% of the time.  The following timeline reflects these two small blips:



- Since 1997, the Property has been held in the Trust 99.6% of the time.
- Twice, in 2002 and 2003, Denise and Daniel followed the advice of their loan officer, Raymond Arocho ("Mr. Arocho") regarding the Property.

**2002 Refinancing Transaction**

- In 2002, Mr. Arocho suggested that the mortgage secured by the Property could be

refinanced to lower the interest rate.

- In 2002, Mr. Arocho stated that the only way to refinance the mortgage secured by the Property was to briefly transfer bare legal title to the Property out of the Trust and back into the Trust.

- Mr. Arocho stated in 2002 that it was industry practice for real property held in trust to be transferred out of, and back into, the trust as part of a refinancing transaction.

- Denise, acting as trustee of the Trust, followed Mr. Arocho's advice and direction and transferred bare legal title for the Property to Denise as an individual on December 19, 2002.

- On December 19, 2002, the refinancing transaction closed.

- One day later, on December 20, 2002, Denise, as an individual, transferred bare legal title to the Property back to Denise, as trustee of the Trust.

- The Trust held beneficial ownership of the Property during the entire 2002 refinancing transaction.

- The two 2002 transfers mirrored each other—one is from *A* to *B* and the other from *B* back to *A*. Specifically, the Property was transferred on December 19, 2002, from the Trust to Denise as an individual and on December 20, 2002, from Denise back to the Trust.

- The two 2002 transfers, when viewed together, are for reasonably equivalent value.

- The two 2002 transfers of title of the Property were merely transfers of bare legal title.

- Denise always intended for the Property to be held in Trust before and after the two 2002 transfers.

- Before transferring the Property's bare legal title to herself as an individual in 2002, Denise, acting as trustee of the Trust, always intended for the Property to be held in Trust.

- Denise, acting as trustee of the Trust did in fact transfer bare legal title to the

Property back into Trust after the 2002 refinancing was completed.

- The refinancing transaction in 2002 was not a fraudulent transfer.
- The refinancing transaction in 2002 was done for the benefit of the Property and the Trust.
- In 2002, Denise and Daniel owned other assets outside the Trust.
- In 2002, Denise and Daniel did not abscond and did not conceal the transfers of bare legal title.  All the transactions related to the Property were recorded and available in the public record.
- In 2002, full consideration was received because, in the span of 1 day, bare legal title to the Property was transferred out of the Trust and back in the Trust.  The two transfers mirrored each other.
- Denise and Daniel were not insolvent around the time of the 2002 refinancing transaction.
- Denise and Daniel did not own the Property before or after the refinancing transaction.
- The refinancing transaction had nothing to do with any future liabilities.
- The refinancing transaction was done to preserve the Property by lowering the interest rate for the mortgage.  Thus, the HELOC was consistent with Denise's obligation, as trustee of the Trust, to preserve Trust property for the benefit of the Trust's beneficiary.
- The transfers of bare legal title in 2002 were not done to "hinder, delay, or defraud" a creditor.  Instead, those transfers of bare legal title were done at the suggestion and requirement of a creditor—the mortgage holder.

**2003 HELOC Transaction**

- In 2003, Denise, acting as trustee of the Trust, identified that the Property needed certain necessary improvements to maintain the Property.
- In early 2003, Mr. Arocho recommended that a $100,000 home equity line of

credit (HELOC) could be used to make improvements to the Property.

- In 2003, Mr. Arocho stated that the only way to obtain the HELOC was to briefly transfer bare legal title to the Property out of the Trust and back into the Trust.
- Mr. Arocho stated in 2003 that it was industry practice for real property held in trust to be transferred out of, and back into, the trust as part of a HELOC transaction.
- Denise, acting as trustee of the Trust, followed Mr. Arocho's advice and direction and transferred bare legal title for the Property to Denise and Daniel as individuals on March 14, 2003.
- On March 14, 2003, the HELOC transaction closed.
- On April 23, 2003 (40 days later), Denise transferred bare legal title to the Property back to Denise, as trustee of the Trust.
- The Trust held beneficial ownership of the Property during the entire 2003 HELOC transaction.
- The two 2003 transfers mirrored each other—one is from *A* to *B* and the other from *B* back to *A*. Specifically, the Property was transferred on March 14, 2003, from the Trust to Denise as an individual and on April 23, 2003, from Denise back to the Trust.
- The two 2003 transfers, when viewed together, are for reasonably equivalent value.
- The two 2003 transfers of title of the Property were merely transfers of bare legal title.
- Denise always intended for the Property to be held in Trust before and after the two 2003 transfers.
- Before transferring the Property's bare legal title to herself as an individual in 2003, Denise, acting as trustee of the Trust, always intended for the Property to be held in Trust.
- Denise, acting as trustee of the Trust did in fact transfer bare legal title to the Property back into Trust after the 2003 HELOC transaction was completed.

14

- The HELOC transaction in 2003 was not a fraudulent transfer.
- The HELOC transaction in 2003 was done for the benefit of the Property and the Trust.
- The HELOC proceeds were used to make improvements to the Property.
- The improvements to the Property increased the value of the Property.
- In 2003, Denise and Daniel owned other assets outside the Trust.
- In 2003, Denise and Daniel did not abscond and did not conceal the transfers of bare legal title.  All the transactions related to the Property were recorded and available in the public record.
- In 2003, full consideration was received because, in the span of 40 days, bare legal title to the Property was transferred out of the Trust and back into the Trust.  These two transfers mirrored each other.
- Denise and Daniel were not insolvent around the time of the HELOC transaction in 2003.
- Denise and Daniel did not own the Property before or after the HELOC transaction in 2003.
- The HELOC refinancing had nothing to do with any future liabilities.
- The HELOC refinancing was done to preserve the Property by providing funds for improvements to the Property.  Thus, the HELOC was consistent with Denise's obligation, as trustee of the Trust, to preserve Trust property for the benefit of the Trust's beneficiary.
- The transfers of bare legal title in 2003 were not done to "hinder, delay, or defraud" a creditor.  Instead, those transfers of bare legal title were done at the suggestion and requirement of a creditor—the mortgage holder.

///
///
///

**C.     Plaintiff's Claim #3: Request to Foreclose on IRS Lien on Property**

**Claim 3**:     If Plaintiff prevails on Claim #1 or Claim #2, Plaintiff is entitled to foreclose on the IRS tax lien that attaches to the Property.

**Elements for Claim 3**:   Plaintiff has the burden to prove:

1.  The IRS has a valid federal tax lien for unpaid taxes of Denise; and
2.  The IRS's federal tax lien attaches to the Property.

**Burden of Proof for Claim 3**:  Plaintiff must establish each of the two elements for Claim 3 by a preponderance of the evidence.

If Plaintiff prevails on Claim 3 and the Court is inclined to order the sale of the Property, then the Nicole Defendants respectfully request that the Court stay the sale to allow the Trustee to voluntarily sell the Property to maximize the sale price.  While the Nicole Defendants are not privy to Denise and Daniel's personal and confidential tax matters, the Nicole Defendants understand that the sale of the Property would generate significant current-year federal and state tax liabilities.  As such, Denise and Daniel would need to maximize the sale price for the Property through a voluntary sale to generate sufficient proceeds to full pay the old IRS and FTB liabilities, as well as generate enough surplus to pay the new taxes from the sale of the Property.

**II.     EVIDENTIARY ISSUES.**

On February 7, 2023, Plaintiff filed a motion in limine to exclude testimony of Samantha Kittle.  In the motion in limine, Plaintiff alleges that Ms. Kittle's testimony is

irrelevant.  The Nicole Defendants disagree and intend to oppose Plaintiff's motion in limine.  Ms. Kittle's testimony is relevant in two main regards:

First, Ms. Kittle's testimony is necessary to support a factual finding that Denise and Daniel owned an additional asset at the time of the HELOC refinancing.  This asset is relevant to two of the factors (Factors 5 and 9) for whether a debtor had actual intent for a fraudulent transfer.  Specifically, these factors consider whether a debtor transferred substantially all their assets (Factor 5) and whether a debtor was insolvent after the transfer (Factor 9).  Both factors require consideration of all the debtor's assets.  Ms. Kittle's testimony would support a factual finding that Denise and Daniel had an additional asset at the time of the 2003 transfer that is both substantial and would make them further solvent.  This asset is a malpractice claim against their tax attorney who represented Denise and Daniel in their U.S. Tax Court case.

Second, Ms. Kittle's testimony is necessary to support a factual finding that Denise was unaware of the IRS liability in 2002 and 2003 when the allegedly fraudulent transfers occurred.  Plaintiff has alleged that Denise either knew or should have known that she was about to incur substantial tax liabilities and that this is why Denise "transferred" the Property to the Trust.  Ms. Kittle's testimony is not a challenge to the underlying liability (as Plaintiff alleges in the motion in limine).  Instead, her testimony is necessary to show that Denise could not have been aware of this substantial liability because Denise does not in fact owe a substantial liability.  Thus, the focus is on Denise's level of knowledge (including constructive knowledge) of the tax liability, given that this liability is objectively far from certain.

## III.   **ATTORNEYS' FEES**

In the answer to the complaint (ECF Doc. No. 24), the Nicole Defendants prayed that the Court award their reasonable costs of suit and attorney fees.  Under I.R.C.

§ 7430, a prevailing party in an action brought by the United States related to the collection of tax may recover reasonable litigation costs incurred in such proceeding. Once a party shows that it is the prevailing party, the United States may raise an affirmative defense that its position during litigation and prelitigation was "substantially justified." *See* I.R.C. § 7430(c)(4)(B).  For the government to meet this standard, a significant factor is whether the IRS and Plaintiff received necessary information from the taxpayer regarding taxpayer's position.  *See* 26 C.F.R. (Treas. Reg.) § 301.7430-5(d)(1).

At trial, the Nicole Defendants will be the prevailing party based on the evidence highlighted above and Plaintiff's inability to meet its burden of proof.  Moreover, Plaintiff's position is not substantially justified because Plaintiff has been in possession of all facts and the taxpayer's legal arguments for several years (dating back to the prior case involving this same matter).  If the Nicole Defendants are the prevailing party, they will bring a timely and appropriate motion after the judgment in this case for attorneys' fees.

## IV.   OTHER MATTERS SPECIFIED IN LOCAL RULE 16-4.

In her counterclaim (ECF Doc. No. 39), the Trustee brought a counterclaim against Plaintiff, requesting that the Court issue an order stating that Plaintiff has no interest in the Property.  The Trustee brought this counterclaim as a quiet title action under 28 U.S.C. § 2410(a)(1).  If Plaintiff does not prevail on Claim 1 or Claim 2, then Plaintiff has represented that it would not pursue any additional action against the Property and this case would be closed.  Based on these representations, the Nicole Defendants abandon their claim to quiet title to the Property.

The parties have not requested a jury trial in this case.

There are no third parties in this case.

The Nicole Defendants do not request that any issues be bifurcated.


HOLTZ, SLAVETT & DRABKIN, APLC


DATED:  February 14, 2023          By: _____

David J. Warner

Attorney for the Nicole Defendants