UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br>v.<br>DENISE DIMACALE, *et al.*,<br><br>    Defendants. | Case No.: 2:21-cv-06012-CBM-RAOx<br><br>**ORDER FOLLOWING BENCH TRIAL** |

Plaintiff, the United States seeks foreclosure against the real property located at 1794 Port Tiffin Circle in Newport Beach, California, with the proceeds to be applied against Defendant Denise Dimacale's income tax liability for tax year 1996. Defendants are Daniel and Denise Dimacale, and their daughter Nicole Dimacale. The Court held a bench trial in this case. The parties filed a Stipulation of Facts for trial, which the Court adopts and incorporates below in its Findings of Facts. (Dkt. No. 108.) After evaluating the evidence at trial, the Court issues the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

            **I.    FINDINGS OF FACTS**

1. Denise and Daniel Dimacale have been married since 1983.
2. They have one child named Nicole Dimacale.

3. On June 3, 1996, Denise and Daniel Dimacale purchased real property located at 1794 Port Tiffin Circle in Newport Beach, California (the "Property"). *See* Dkt. 97, Ex. 1.

4. The Property was purchased for $888,000 and initially had a mortgage of $577,500.

5. Denise Dimacale was an owner, secretary, and director of a business known as World Class Network, Inc. ("WCN").

6. Daniel Dimacale was co-owner of WCN and the chairman of its board of directors.

7. On February 28, 1997, the Federal Trade Commission (FTC) sued WCN, Daniel Dimacale, Denise Dimacale, and others in the case of *Federal Trade Commission v. World Class Network, Inc. et al.,* case number SACV-97-162 AHS (C.D. Cal.).

8. On May 6, 1997, the district court entered judgment against Daniel and Denise Dimacale in the amount of $1,702,000 in favor of the FTC.

9. By May 31, 1997, Daniel and Denise Dimacale fully paid off the FTC judgment.

10. On August 12, 1997, Daniel and Denise Dimacale formed the "NCD Qualified Personal Residence Trust" (the "Trust"), with the assistance of their estate planning attorney, Steven Kray.

11. Mr. Kray recommended that Daniel and Denise set up the Irrevocable Trust as part of their estate plan.

12. The Dimacales created the Irrevocable Trust.

13. Daniel and Denise Dimacale named Felicisima Reyes, the aunt of Daniel Dimacale, as the trustee of the Trust.

14. Denise and Daniel Dimacale each filed Forms 709, Federal Gift Tax Returns, reporting as gifts the transfer to Nicole Dimacale of her rights in the Property under the terms of the Trust. *See* Dkt. No. 97, Exs. 54 and 65.

15. On August 20, 1997, a grant deed was recorded transferring the Property from Daniel and Denise to Felicisima Reyes, as trustee of the Trust. *See* Dkt. No. 97, Ex. 5.
16. Consistent with the terms of the Trust, Daniel and Denise Dimacale lived in the property rent-free since the Trust was formed.
17. From the date the Trust was formed to the present, Daniel and Denise Dimacale paid the utilities; maintenance, repair and improvement costs, insurance, and taxes associated with the Property.
18. The Trust has not had a bank account in its name since its creation.
19. For tax years 2016 through 2020, Daniel and Denise Dimacale deducted the home mortgage interest on Schedule A of their U.S. Individual Income Tax Returns in the amount of $44,470 for 2016, $50,482 for 2017, $49,372 for 2018, $51,572 for 2019, and $40,714 for 2020.
20. On October 17, 1997, Daniel and Denise Dimacale filed their joint U.S. Individual Income Tax Return (Form 1040) for tax year 1996, in which they reported taxable income of $315,960, and a tax liability of $105,280.
21. On November 30, 2001, the IRS issued a statutory notice of income tax deficiency to Daniel and Denise Dimacale for tax years 1996 and 1997. Daniel and Denise hired an attorney to advise them on the money they owed to the IRS.
22. On March 13, 2002, Daniel and Denise Dimacale filed a petition in the United States Tax Court for a redetermination of their tax liabilities.
23. In 2002, the Dimicale's loan officer, Raymond Arocho, advised the Dimacales that interest rates were low and that they could refinance the loan on the Property to an adjustable-rate mortgage.
24. Mr. Arocho testified that in real estate transactions, if property is in the name of a trust, bare legal title is transferred out of the trust to the name of the trustee or an individual, and subsequently placed back in the trust.

25. Consistent with that understanding, Mr. Arocho advised the Dimacales that in order to refinance the loan on the Property, they would need to temporarily transfer the bare legal title of the Property to the name of the individuals who were assuming the obligation on the mortgage.
26. Mr. Arocho testified that he was aware of the Dimacale's intention for the Trust to remain the true owner of the Property and guided them through the process of transferring title of the Property in order to effectuate the refinance.
27. Therefore, the Property was transferred from Felicisima Reyes, as trustee of the Trust, to Denise Dimacale, as trustee for the Trust. The quitclaim deed was recorded on July 18, 2002. *See* Dkt. No. 97, Ex. 11.
28. In September of 2002, Denise Dimacale applied for a loan with Kastlepoint Mortgage Inc. ("Kastlepoint Loan Application"). At that time, Denise Dimacale was the Trustee of the Trust.
29. On October 2, 2002, Denise Dimacale signed the Kastlepoint Loan Application. *See* Dkt. No. 97, Ex. 12.
30. Denise Dimacale ultimately did not obtain a loan from Kastlepoint.
31. On December 12, 2002, Denise Dimacale applied for a loan of $850,000 with Saxon Mortgage, Inc. ("Saxon") in order to refinance the loan on the Property. At this time, Denise Dimacale was the trustee of the Trust. *See* Dkt. No. 97, Ex. 13.
32. On December 19, 2002, the Property was refinanced, and the $850,000 loan was funded by Saxon.
33. The balance owed on the loan from Saxon Mortgage as of February 3, 2023, was $475,629.27.
34. Daniel and Denise Dimacale paid personal debts with some of the proceeds from the Saxon Mortgage.

35. On December 19, 2002, a grant deed was recorded transferring the Property from Denise Dimacale, as trustee of the Trust, to Denise Dimacale as her sole and separate Property. *See* Dkt. No. 97, Ex. 14.
36. That same day, a Deed of Trust was recorded with Denise Dimacale, as trustor in her sole and separate property, and First American Title as trustee, for the benefit of Saxon Mortgage. *See* Dkt. No. 97, Ex. 15.
37. On December 20, 2002, a grant deed was recorded transferring the Property from Denise Dimacale, as her sole and separate property, to Denise Dimacale, as trustee of the Trust. *See* Dkt. No. 97, Ex. 17.
38. Mr. Arocho testified that he subsequently informed Daniel and Denise that after the refinance, the Property had enough equity such that they could acquire a line of credit to make improvements to the Property.
39. On December 20, 2002, Denise and Daniel Dimacale signed a Uniform Residential Loan Application ("CIT Loan Application") to apply for a $100,000 line of credit with The CIT Group/Consumer Finance, Inc. (the "CIT Group"). Denise Dimacale was the trustee of the Trust at this time. *See* Dkt. No. 97, Ex. 18.
40. The CIT Group approved the $100,000 line of credit with Daniel and Denise Dimacale listed as co-borrowers. *Id.*
41. The Court finds that the line of credit was used to pay for improvements and repairs related to the Property based on Denise Dimacale's testimony, and there is no evidence to the contrary.
42. On January 6, 2003, an Interspousal Transfer Grant Deed was recorded to transfer Daniel Dimacale's interest in the Property to Denise Dimacale. *See* Dkt. No. 97, Ex. 19.
43. On March 14, 2003, a Grant Deed was recorded transferring the Property from Denise Dimacale, as trustee of the Trust, to Denise and Daniel Dimacale, as husband and wife as joint tenants. *See* Dkt. No. 97, Ex. 20.

44. On March 14, 2003, a Deed of Trust was recorded with Denise and Daniel Dimacale as trustors and First American Title as trustee, for the benefit of The CIT Group. *See* Dkt. No. 97, Ex. 21.
45. The Deed of Trust secured a "home equity line of credit" ("HELOC") on the Property in favor of Denise and Daniel Dimacale in the amount of $100,000.
46. As of January 20, 2023, the balance owed on the CIT Group line of credit was $28,424.98.
47. Subsequently, the Dimacale's tax attorney advised them to concede the tax court case and handle the debt through an offer in compromise or bankruptcy, without determining whether the IRS made a mistake in the audit.
48. Thus, on April 1, 2003, the Tax Court entered a decision pursuant to the agreement of the parties—Daniel and Denise Dimacale and the Commissioner of Internal Revenue—regarding the deficiencies in income tax due for tax years 1996 and 1997 in the amounts of $637,361.88 and $2,186, respectively, plus an accuracy-related penalty pursuant to 26 U.S.C. § 6662(a) in the amount of $76,483.42. *See* Dkt. No. 97, Ex. 9.
49. After the Dimacales obtained the line of credit, they transferred the Property back into the Trust.
50. On April 23, 2003, a quitclaim deed was recorded transferring the Property from Daniel and Denise Dimacale to Denise Dimacale as her sole and separate property. *See* Dkt. No. 97, Ex. 22.
51. The same day, a quitclaim deed was recorded transferring the Property from Denise Dimacale, as her sole and separate property to Denise Dimacale, as trustee of the Trust. *See* Dkt. No. 97, Ex. 23.
52. On September 8, 2003, the IRS assessed the additional tax and penalty for tax year 1996 pursuant to the stipulated Tax Court Decision.

53. On April 6, 2004, the IRS recorded a notice of federal tax lien (NFTL) against Daniel and Denise Dimacale with the Orange County Recorder's Office for tax year 1996.
54. On October 12, 2004, a quitclaim deed was recorded transferring the Property from Denise Dimacale, as trustee of the Trust, to Felicisima Reyes, as trustee of the Trust. *See* Dkt. No. 97, Ex. 25.
55. On March 15, 2005, Daniel Dimacale filed chapter 7 bankruptcy in the Central District of California, case number 8:05-bk-11530-ES.
56. On June 27, 2005, Daniel Dimacale received a discharge in his chapter 7 bankruptcy.
57. On July 28, 2005, James Joseph, as Chapter 7 Trustee in Daniel Dimacale's chapter 7 bankruptcy, filed a complaint in an adversary proceeding, case number 8:05-ap-01337-ES, seeking to recover the Property for Daniel Dimacale's bankruptcy estate by setting aside the transfer of the Property held by the Trust as a fraudulent transfer.
58. On June 13, 2006, the complaint filed by the Trustee on July 28, 2005, was dismissed with prejudice.
59. On September 21, 2012, the United States filed suit against Denise Dimacale to reduce the tax liability to judgment.
60. On January 6, 2014, the Court entered a judgment against Denise Dimacale in the amount of $1,901,763.57 as of September 18, 2012, for tax year 1996.
61. On October 15, 2015, a quitclaim deed was recorded transferring the Property from Felicisima Reyes, as trustee of the Trust to Nicole Dimacale, as trustee of the Trust. *See* Dkt. No. 97, Ex. 31.
62. Any finding of fact which constitutes a conclusion of law is hereby adopted as a conclusion of law. Any conclusion of law which is determined to be a finding of fact is so deemed.

## II. CONCLUSIONS OF LAW

### A. Foreclosure of Federal Tax Lien Against the Property (Claim One)

1. Treasury Regulation § 25.2702-5(c) sets forth the rules relating to the establishment and maintenance of Qualified Personal Residence Trusts ("QPRT").

2. The IRS rules governing QPRTs require the trustor(s) of the QPRT to live in the property that is transferred to the QPRT as their residence for the entire term of the QPRT, without paying rent. Treas. Reg. § 25.2702-5(c).

3. To qualify as a QPRT, a trust must contain certain requirements, including that (1) the trust be irrevocable, (2) the trustor must use the residence as their personal residence during the trust term without paying rent, and (3) the trust must hold only the personal residence. Treas. Reg. § 25.2702-5(c).

4. The IRS rules also require the trustor(s) to pay for the maintenance and upkeep of the residence that is transferred to the QPRT during the term of the QPRT. *Id.*

5. At the end of the QPRT trust term, the beneficiary receives fee simple title to the personal residence and the trust terminates.

6. At the end of the QPRT's term, the residence that was transferred to the QPRT is owned outright by the beneficiary of the QPRT.

7. The retained use and enjoyment of a real property after it has been transferred to the QPRT and continued payment of all expenses associated with the real property are facts consistent with the requirements of a valid QPRT. Treas. Reg. § 25.2702-5(c)(2)(ii).

8. The grantor of a QPRT retains the right to live at the residence rent free but has to pay all costs associated with the residence for the duration of the trust term.

9. Daniel and Denise complied with the requirements governing the Trust. Thus, the Trust qualifies as a QPRT.

10. The Government's first cause of action is for foreclosure of the IRS's tax lien against the Property on the grounds that the Property was held by the Trust as a nominee in regard to the refinance of the home in 2002 and acquiring the line of credit in 2003. *See Findings of Fact No. 27 and 34.*

11. The nominee doctrine is an equitable device to prevent debtors or taxpayers from evading liability by shielding property from collection through fake transfers of the property to another entity. *Prompt Staffing, Inc. v. United States*, 321 F. Supp. 3d 1157, 1170 (C.D. Cal. 2018) (citing William D. Elliot, *Fed. Tax Collect. Liens & Levies,* ¶ 9.10 Nominee Liens and Alter Ego, 2018).

12. When a debtor transfers property to another entity, but continues to exercise ownership over that property, the law treats the debtor as the true owner of the property for liability purposes. *Id*. (citing Elliot at *1.).

13. The nominee doctrine addresses the relationship between the taxpayer and the property sought to be accessed. *Id*. It asks whether the taxpayer treats the property as his own and enjoys the benefits of true ownership even though another entity holds legal title. *Id*. (citing *Fourth Inv. LP v. United States*, 720 F.3d 1058, 1066 (9th Cir. 2013) (holding that "[a] nominee is one who holds bare legal title to property for the benefit of another."))

14. The nominee doctrine requires the application of federal and state common law. *Id*. at 1170-71. State law creates the property right and federal law attaches consequences to that property right. *Id*. at 1171 (citing *United States v. Craft*, 535 U.S. 274, 278 (2002)). When attaching a tax lien to property, a court's analysis requires two steps. First, the court looks to state law to determine what rights the taxpayer has in the property the Government seeks to reach. *Id*. Second, if the court determines that the taxpayer has a property interest under state law, it then looks to federal law to determine whether the taxpayer's state-delineated rights qualify as property or rights to property within the compass of the federal tax lien legislation. *Id*.

15. In determining whether taxpayers hold property rights to which a tax lien may attach, the District Court must look to state law. *United States v. Craft*, 535 U.S. at 278 (the federal tax lien statute attaches federal consequences to rights created under state law); *Drye v. United States*, 528 U.S. 49, 58 (1999) (state law determines what rights a taxpayer has in property; then federal law determines whether those rights qualify as property sufficient for a lien to attach under 26 U.S.C. § 6321); *Aquilino v. United States*, 363 U.S. 509, 513 (1960).

16. The Ninth Circuit has held that "California law recognizes a nominee theory of property ownership." *Fourth Inv. LP v. United States*, 720 F.3d at 1069. Furthermore, the Ninth Circuit has opined that "if the California Supreme Court had occasion to evaluate the factors relevant to determining nominee ownership under California law, it would adopt the uniform set of factors generally recognized by federal courts." *Id*.

17. The following six factors are considered when evaluating whether property is held by a nominee:
    a. Whether inadequate or no consideration was paid by the nominee;
    b. Whether the properties were placed in the nominee's name in anticipation of a lawsuit or other liability while the transferor remains in control of the property;
    c. Whether there is a close relationship between the nominee and the transferor;
    d. Failure to record the conveyances;
    e. Whether the transferor retained possession; and
    f. Whether the transferor continues to enjoy the benefits of the transferred property. *Id*. at 1070. *See also Towe Antique Ford Found. v. IRS*, 999 F.2d 1387, 1391 (9th Cir. 1993).

18. "[C]ourts focus on the totality of the circumstances," and no single factor is

dispositive. *Fourth Inv. LP*, 720 F.3d at 1070 (citing *Dalton v. Comm'r*, 682 F.3d 149, 158 (1st Cir. 2012)).

19. The Court "must give particularly close scrutiny to the facts" when there are family members on both sides of the transfer. *Caligiuri v. Commissioner*, 549 F.2d 1155, 1157 (8th Cir. 1977) (analyzing intra-family debt); *Estate of Schuler v. Commissioner*, 282 F.3d 575, 579 (8th Cir. 2002) (intrafamily transfers demand "close scrutiny" precisely because the genuineness of the transaction cannot reasonably be inferred from assurances from the taxpayer).

20. An evaluation of the totality of the circumstances in this case strongly indicates that the Property was not held by the Trust as a nominee.

21. Daniel and Denise retained a limited interest in the Property as defined in the Trust Agreement and consistent with the rules established by the IRS for QPRTs.

22. Under the terms of the Trust and Treas. Reg. § 25.2702-5(c), Daniel and Denise were required to live in the Property during the 30-year period of the Irrevocable Trust without paying rent.

23. Under the terms of the Trust, Daniel and Denise were required to pay the necessary expenses to maintain the Property.

24. Each time title to the Property changed, the transfer was recorded.

25. At the time of the refinance and acquiring a line of credit, there was no pending lawsuit.

26. Denise Dimacale intended for the Trust to remain the true owner of the Property, and any transfers were for bare legal title only, consistent with the advice of her loan officer, Mr. Arocho.

27. The Government has not proved by a preponderance of the evidence that the Trust held the Property as the nominee of Denise Dimacale.

28. Therefore, the lien arising from the tax liability does not attach to the Property under the first cause of action.

**B.     Fraudulent Transfer (Claim Two)**

29. The Government's claim for fraudulent transfer is based on the transfer of the Property from Denise Dimacale to the Trust on April 23, 2003 (the "April 2003 transfer").

30. The Government contends the April 2003 transfer constituted a fraudulent transfer under Cal. Civ. Code § 3439.04(a)(1) and Cal. Civ. Code § 3439.04(a)(2) because the transfer was made with actual intent to hinder, delay, or defraud the IRS, and because the transfer was for less than fair market value, respectively.

31. A fraudulent transfer may be avoided to the extent necessary to satisfy a creditor's claim. Cal. Civ. Code § 3439.07(a)(1). A transfer made by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made, if the debtor made the transfer with actual intent to hinder, delay, or defraud any creditor of the debtor. Cal. Civ. Code § 3439.04(a)(1).

32. In California, the burden is on the plaintiff to establish "actual intent" by a preponderance of the evidence. *Liodas v. Sahadi*, 19 Cal. 3d 278 (1977).

33. Actual intent is established from the circumstances surrounding the transfer of the assets involved. *Menick v. Goldy*, 131 Cal. App. 2d 542 (1955).

34. In determining actual intent, the court may consider the following non-exclusive list of factors:

    a.  Whether the transfer or obligation was to an insider.
    b.  Whether the debtor retained possession or control of the property transferred after the transfer.
    c.  Whether the transfer or obligation was disclosed or concealed.
    d.  Whether before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.
    e.  Whether the transfer was of substantially all the debtor's assets.

  f. Whether the debtor absconded.

  g. Whether the debtor removed or concealed assets.

  h. Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

  i. Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

  j. Whether the transfer occurred shortly before or shortly after a substantial debt was incurred.

  k. Whether the debtor transferred the essential assets of the business to a lienor that transferred the assets to an insider of the debtor. Cal. Civ. Code § 3439.04(b).

35. An evaluation of these factors indicates that Denise Dimacale had no "Actual intent" to hinder, delay, or defraud the IRS by transferring the Property from herself back to the Trust on April 23, 2003.

36. While Denise retained possession of the Property and the tax court had issued its decision regarding the deficiencies in income tax due before the April 23, 2003 transfer, Denise Dimacale was transferring the Property back to the Trust after acquiring the line of credit.

37. The line of credit was acquired at the advice of Mr. Arocho who advised the Dimacales that it would be advantageous for them to consolidate debt.

38. In order to secure the line of credit, it was a requirement for the Property to be temporarily transferred out of the Trust into the individual names of Daniel and Denise, who were co-borrowers on the loan.

39. The Dimacales applied for the line of credit on December 20, 2002, before the tax court issued its final decision on April 1, 2003. *See* Dkt. No. 97, Ex. 18.

40. The line of credit was used to pay for improvements and repairs related to the Property and there is no evidence to the contrary.

41. Denise Dimacale did not intend for the loan to revoke the QPRT Trust.
42. On April 23, 2003, a quitclaim deed was recorded transferring the Property from Daniel and Denise Dimacale back to Denise Dimacale as her sole and separate property.
43. That same day, a quitclaim deed was recorded transferring the Property from Denise Dimacale, as her sole and separate property back to Denise Dimacale as trustee of the Trust.
44. In sum, the Property was transferred from Denise Dimacale, trustee of the Trust, to Daniel and Denise as joint tenants, then back to Denise as her sole property and trustee of the Trust, within one month's time in order to secure the line of credit.
45. The evidence shows that the April 2003 transfer of title to the Property was a transfer of bare legal title to restore record title back to the Trust, and thus was not a fraudulent transfer.
46. The evidence shows that Denise Dimacale intended for the Trust to remain the owner of the Property at all times from the creation of the Trust until present.
47. Thus, the Government has not proved by a preponderance of the evidence that the transfer of record title to the Property was a fraudulent conveyance.

**IT IS SO ORDERED.**

DATED: MAY 17, 2024

HON. CONSUELO B. MARSHALL
UNITED STATES DISTRICT JUDGE